Approved: _____
SAMSON ENZER / ELIZABETH HANFT
Assistant United States Attorneys

Before:  THE HONORABLE GABRIEL W. GORENSTEIN
United States Magistrate Judge
Southern District of New York

**21 MAG 1600**

- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :    **SEALED COMPLAINT**
                                 :
        - v. -                   :    Violations of
                                 :    18 U.S.C. §§ 371,
JOHN DAVID MCAFEE,               :    1343, 1349, 1956 and 2.
                                 :
              Defendant.         :    COUNTY OF OFFENSES:
                                 :    New York
- - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

    BRANDON RACZ, being duly sworn, deposes and says that he is
a Special Agent with the Federal Bureau of Investigation ("FBI")
and charges as follows:

## COUNT ONE
### (Commodities and Securities Fraud Conspiracy: Scalping)

    1.   From at least in or about December 2017, up to and
including in or about October 2018, in the Southern District of
New York and elsewhere, JOHN DAVID MCAFEE, the defendant, and a
co-conspirator not named as a defendant herein ("CC-1"), as well
as others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit offenses against the United States, to wit, commodities
fraud, in violation of Title 7, United States Code, Sections 9(1)
and 13(a)(5), and Title 17, Code of Federal Regulations, Section
180.1(a), and securities fraud, in violation of Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 17, Code of
Federal Regulations, Section 240.10b-5.

    2.   It was a part and an object of the conspiracy that JOHN
DAVID MCAFEE, the defendant, and CC-1, as well as others known and
unknown, willfully and knowingly, would and did use and employ,
and attempt to use and employ, in connection with a contract of
sale of a commodity in interstate commerce, manipulative and

deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 180.1, by: (a) using and employing, and attempting to use and employ, manipulative devices, schemes, and artifices to defraud; (b) making, and attempting to make, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made not untrue or misleading; and (c) engaging, and attempting to engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, MCAFEE and CC-1 agreed to participate in a scalping scheme in which they would and did buy publicly traded altcoins qualifying as commodities, used false and misleading Twitter messages to recommend those altcoins for investment by members of the investing public without disclosing that they had taken investment positions in those altcoins with the intention of selling them in the short term, and then sold the altcoins into the short-term market interest stimulated by the deceptive recommendations.

3.    It was further a part and an object of the conspiracy that JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, MCAFEE and CC-1 agreed to participate in a scalping scheme in which they would and did buy publicly traded altcoins qualifying as securities, used false and misleading Twitter messages to recommend those altcoins for investment by members of the investing public without disclosing that they had taken investment positions in those altcoins with the intention of selling them in the short term, and then sold the altcoins into the short-term market interest stimulated by the deceptive recommendations.

<u>Overt Acts</u>

4.   In furtherance of the conspiracy and to effect its illegal objects, JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   During the period from in or about December 2017 through in or about January 2018, MCAFEE and CC-1 scalped altcoins to investors at artificially inflated market prices, including to several investors who resided in the Southern District of New York.

b.   On or about January 11, 2018, another McAfee Team member and co-conspirator of MCAFEE (who is referred to below as "McAfee Team Member-1") submitted an application online to open an account with a digital asset exchange located in the Southern District of New York (the "SDNY Exchange") so that he and MCAFEE could liquidate (among other things) digital asset proceeds of the scalping scheme.

c.   On or about January 14, 2018, McAfee Team Member-1 sent an email to the SDNY Exchange in which he identified himself as an "employee of John McAfee," and threatened to sue the SDNY Exchange for rejecting that application.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Wire Fraud Conspiracy: Scalping)**

5.   From at least in or about December 2017, up to and including in or about October 2018, in the Southern District of New York and elsewhere, JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

6.   It was a part and an object of the conspiracy that JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television

communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, MCAFEE and CC-1 agreed to participate in the scalping scheme described in paragraphs 2 and 3 above that would and did involve the use of interstate wire communications.

(Title 18, United States Code, Section 1349.)

## COUNT THREE
### (Wire Fraud: Scalping)

7.    From at least in or about December 2017, up to and including in or about October 2018, in the Southern District of New York and elsewhere, JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MCAFEE and CC-1 participated in the scalping scheme described in paragraphs 2 and 3 above and they used interstate wire communications in the course of doing so.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
### (Securities and Touting Fraud Conspiracy: Touting)

8.    From at least in or about December 2017, up to and including in or about October 2018, in the Southern District of New York and elsewhere, JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and touting fraud, in violation of Title 15, United States Code, Sections 77q(b) and 77x.

9.    It was a part and an object of the conspiracy that JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of

4

the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, MCAFEE and CC-1 agreed to participate in a touting scheme in which they would and did publish Twitter messages recommending certain initial coin offerings ("ICOs") qualifying as securities offerings to members of the investing public through false and misleading representations and omissions concealing that the ICO issuers were paying MCAFEE and CC-1 a substantial portion of the funds raised from ICO investors to publish such ICO recommendations.

10.   It was further a part and an object of the conspiracy that JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instruments of transportation and communication in interstate commerce and of the mails, would and did publish, give publicity to, and circulate notices, circulars, advertisements, newspapers, articles, letters, investment services, and communications which, though not purporting to offer securities for sale, described such securities for consideration received and to be received from issuers, underwriters, and dealers, without fully disclosing the receipt, whether past and prospective, of such consideration and the amount thereof, in violation of Title 15, United States Code, Sections 77q(b) and 77x, to wit, MCAFEE and CC-1 agreed to participate in a touting scheme in which they would and did publish Twitter messages recommending certain ICOs qualifying as securities offerings to members of the investing public without disclosing the nature, source, and amount of compensation that they were being paid by the ICO issuers in exchange for publishing such ICO recommendations.

## Overt Acts

11.   In furtherance of the conspiracy and to effect its illegal objects, JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, committed the following overt

acts, among others, in the Southern District of New York and elsewhere:

      a.    During the period from on or about December 20, 2017 through on or about February 10, 2018, MCAFEE published Twitter messages recommending several ICOs without disclosing the compensation that the ICO issuers were paying him and other members of his team, including CC-1, for those ICO recommendations, and at least one investor who resided in the Southern District of New York purchased ICO tokens based on his review of MCAFEE's ICO recommendations on Twitter.

      b.    On or about January 1, 2018, MCAFEE opened an account in his own name at a digital asset exchange in California (the "California Exchange") with assistance from CC-1 and CC-1's then-wife.

      c.    During the period from in or about January 2018 through in or about February 2018, MCAFEE and CC-1 caused CC-1's then-wife to use MCAFEE's California Exchange account to liquidate (among other things) digital asset proceeds of the ICO touting scheme into millions of dollars in United States currency, and to wire transfer more than a million dollars in such liquidation proceeds to a bank account registered to MCAFEE in Tennessee via transactions that were routed through an intermediate bank in the Southern District of New York (the "SDNY Intermediate Bank").

      d.    In or about April 2018, MCAFEE and CC-1 caused CC-1's then-wife to submit an application online to open an account at the SDNY Exchange so that MCAFEE and CC-1 could liquidate (among other things) digital asset proceeds of the ICO touting scheme.

(Title 18, United States Code, Section 371.)

**COUNT FIVE**
**(Wire Fraud Conspiracy: Touting)**

    12.    From at least in or about December 2017, up to and including in or about October 2018, in the Southern District of New York and elsewhere, JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

    13.    It was a part and an object of the conspiracy that JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and

6

unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, MCAFEE and CC-1 agreed to participate in the ICO touting scheme described in paragraphs 9 and 10 above, in which they would and did induce investors to buy digital tokens sold by ICO issuers based on their publication of fraudulent Twitter recommendations touting the issuers' ICOs through false and misleading representations and omissions concealing that the ICO issuers were paying MCAFEE and CC-1 a substantial portion of the funds raised from ICO investors to publish such ICO recommendations, and would and did use interstate wire communications in the course of doing so.

(Title 18, United States Code, Section 1349.)

## COUNT SIX
### (Wire Fraud: Touting)

14.  From at least in or about December 2017, up to and including in or about October 2018, in the Southern District of New York and elsewhere, JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MCAFEE and CC-1 participated in the ICO touting scheme described in paragraphs 9, 10 and 13 above and they used interstate wire communications in the course of doing so.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SEVEN
### (Money Laundering Conspiracy)

15.  From at least in or about December 2017, up to and including in or about October 2018, in the Southern District of New York and elsewhere, JOHN DAVID MCAFEE, the defendant, and

CC-1, as well as others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1957(a).

16.  It was a part and an object of the conspiracy that JOHN DAVID MCAFEE, the defendant, and CC-1, as well as others known and unknown, in the United States and in the special and maritime and territorial jurisdiction of the United States, willfully and knowingly would and did engage and attempt to engage in one and more monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, the wire fraud offense charged in Count Six of this Complaint, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

17.  I have been an FBI Special Agent for approximately five years.  I am currently assigned to an FBI squad focused on investigating complex financial crimes, including securities frauds, commodities frauds, and wire frauds.  As part of my work at the FBI, I have received training regarding ways in which these crimes are perpetrated, participated in numerous investigations of such offenses, and made and participated in arrests of individuals who have committed such offenses.

18.  Since in or about June 2018, I have been investigating certain fraudulent cryptocurrency trading and promotion activities of JOHN DAVID MCAFEE, the defendant, and other members of MCAFEE's so-called cryptocurrency team (the "McAfee Team"), including CC-1.  I am one of the FBI case agents with primary responsibility for this investigation.  The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including:  (a) conversations with, and reports prepared by, other law enforcement agents; (b) information and documents obtained from non-law enforcement witnesses, including three former McAfee Team members ("McAfee Team Member-1," "McAfee Team Member-2," and "McAfee Team Member-3," respectively) and certain investors in cryptocurrency altcoins and ICOs that were promoted by MCAFEE via Twitter; (c) electronic communications involving MCAFEE and CC-1 that were provided by non-law enforcement witnesses or recovered pursuant to judicially

authorized search warrants, including emails, cellphone text messages, Skype messages, and private direct messages ("DMs") sent to or from MCAFEE's verified Twitter account (the "Official McAfee Twitter Account"); (d) Google search history results associated with CC-1 that were obtained pursuant to a judicially authorized search warrant; (e) public "tweets" and other information that were posted on the publicly available portions of the Official McAfee Twitter Account; (f) other publicly available information and documents, including trading price, volume, and other market information concerning the altcoins discussed herein; (g) documents and other evidence collected by the United States Securities and Exchange Commission (the "SEC") in connection with a parallel SEC investigation relating to MCAFEE and CC-1; (h) materials published by the Commodity Futures Trading Commission (the "CFTC"); (i) account information and records for bank accounts and digital asset exchange accounts that were controlled by various McAfee Team members; and (j) information and documents provided by other companies or businesses. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## SUMMARY OF THE FRAUDULENT SCHEMES

19.  Based on the evidence set forth below, I respectfully submit that there is probable cause to believe that JOHN DAVID MCAFEE, the defendant, and other McAfee Team members, including CC-1, perpetrated two fraudulent schemes relating to the sale to investors of cryptocurrencies qualifying under federal law as commodities or securities (the "scalping scheme" and "ICO touting scheme," respectively):

a.  ***The scalping scheme.*** The first scheme involved a fraudulent practice called "scalping," which is sometimes referred to as a "pump and dump" scheme. In this scalping scheme, MCAFEE and other McAfee Team members, including CC-1, bought large quantities of publicly traded cryptocurrency altcoins, which qualified as commodities or securities, at inexpensive market prices; published false and misleading tweets via the Official McAfee Twitter Account recommending those altcoins for investment to members of the investing public in order to artificially inflate (or "pump" up) their market prices; and then sold (or "dumped") their investment positions in those altcoins into the short-term

market interest stimulated by MCAFEE's deceptive tweets.  Through this scalping scheme, MCAFEE and other McAfee Team members, including CC-1, collectively earned more than $2 million in illicit profits while the long-term value of the recommended altcoins purchased by investors declined substantially as of a year after the promotional tweets.

        b.  ***The ICO touting scheme.***  In the second scheme, MCAFEE and other McAfee Team members, including CC-1, again used MCAFEE's Official McAfee Twitter Account to publicly tout fundraising events in which startup businesses ("ICO issuers") issued and sold digital tokens qualifying as securities to the investing public through ICOs, without disclosing and, in fact, concealing that the ICO issuers were substantially compensating MCAFEE and his team for his promotional tweets with a substantial portion of the funds raised from ICO investors.  As the SEC had publicly warned, and as MCAFEE and CC-1 well knew, the federal securities laws required them to disclose any compensation paid by ICO issuers for touting securities offerings styled as ICOs. MCAFEE and other McAfee Team members, including CC-1, collectively earned more than $11 million in undisclosed compensation that they took steps to affirmatively hide from ICO investors.

## BACKGROUND

### A.  Relevant Individuals

20.  Based on my review of publicly available information and information maintained in law enforcement databases concerning McAfee Team members, including JOHN DAVID MCAFEE, the defendant, and other sources referenced in paragraph 18 above, I have learned the following:

        a.  MCAFEE is a 75 year-old United States citizen. MCAFEE founded and later sold the popular computer antivirus software company that bears his name.  For much of the scalping and ICO touting schemes described herein, which occurred from in or about December 2017 through in or about October 2018, MCAFEE lived in Lexington, Tennessee.  In the years leading up to those schemes, MCAFEE attracted a substantial Twitter following to his Official McAfee Twitter Account, totaling approximately 784,000 Twitter followers as of in or about February 2018, many of whom were cryptocurrency investors.  Through public tweets, speeches at industry conferences and on YouTube, and his role as the CEO of a publicly traded cryptocurrency company, MCAFEE held himself out as an expert on cybersecurity and cryptocurrency.

b.     CC-1 is a 39-year-old United States citizen.  In or about November 2017, CC-1 began working as a private security guard for MCAFEE and moved into MCAFEE's home in Tennessee.  While CC-1 was living and working with MCAFEE, MCAFEE promoted CC-1 to the role of "Executive Advisor" and later to CEO of the McAfee Team. In or about October 2018, CC-1 left the McAfee Team.

c.     McAfee Team Member-1 is a 30-year-old United States citizen who was a co-conspirator of MCAFEE and CC-1 in the scalping and ICO touting schemes.[1]  McAfee Team Member-1 served as MCAFEE's main cryptocurrency trader principally responsible for buying and selling altcoins on MCAFEE's behalf in furtherance of the scalping and ICO touting schemes.

d.     McAfee Team Member-2 is a 44-year-old United States citizen who was a co-conspirator of MCAFEE and CC-1 in connection with the scalping and ICO touting schemes.  McAfee Team Member-2 began working as a private security guard for MCAFEE in or about 2017 and moved into MCAFEE's home in Tennessee in or about January 2018.

e.     McAfee Team Member-3 is a 30-year-old United States citizen who was married to CC-1 at all times during the scalping and ICO touting schemes, but they have since divorced.[2]  At the request of her then-husband CC-1, McAfee Team Member-3 was enlisted by MCAFEE and CC-1 at various times to liquidate digital assets representing proceeds of the scalping and ICO touting schemes.

**B.     Cryptocurrency Technology and Regulation**

21.     Based on my review of a report published in October 2020 by the United States Attorney General's Cyber Digital Task Force concerning cryptocurrency, information published by the SEC and CFTC, other sources referenced in paragraph 18 above, and my own participation in this investigation, I have learned the following:

---

[1] McAfee Team Member-1 has a criminal history that includes a 2011 felony conviction.

[2] McAfee Team Member-1, McAfee Team Member-2 and McAfee Team Member-3 have been providing the Government with information in the hope of obtaining leniency for their respective roles in the scalping and touting schemes described herein or in laundering proceeds of those schemes.  Information provided by all three of these witnesses has proven reliable and has been corroborated by other independent evidence.

a.    "Digital currency" or "cryptocurrency" is a digital representation of value that, like traditional coin and paper currency, functions as a medium of exchange — that is, it can be digitally traded or transferred, can be used for payment or investment purposes, and can be considered a valuable "digital asset." Unlike traditional "fiat" currency such as the United States dollar, digital currency is not issued by any government and does not have legal tender status in any particular country or for any government or other creditor. Instead, the exchange value of a particular digital currency generally is based on agreement or trust within its community of users. Examples of digital currencies, which come in the form of unique digital "tokens" or "coins," are "Bitcoin" ("BTC") and "Ether" ("ETH"), and, generally speaking, "altcoins," which typically refer to cryptocurrencies other than Bitcoin.

b.    Cryptocurrency tokens or coins are issued and distributed on a "blockchain." A blockchain is a digitalized, decentralized, and cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping. Blockchain records are published online and available to the public.

c.    Cryptocurrency can be exchanged directly from person to person; through a digital asset or cryptocurrency exchange; or through other intermediaries. The storage of cryptocurrency is typically associated with an individual "wallet," which is similar to a virtual account. Wallets can interface with blockchains and generate or store the public keys (which are roughly akin to a bank account number) and private keys (which function like a personal identification number or password) that are used to send and receive cryptocurrency.

d.    Certain uses and aspects of digital currencies qualify them as commodities under the Commodity Exchange Act of 1936 and CFTC regulations promulgated thereunder prohibiting (among other things) fraud or manipulation in connection with any swap or contract of sale of any commodity in interstate commerce. From my participation in this investigation and sources referenced in paragraphs 18 and 21 above, I understand that at all times relevant to this case, several of the altcoins discussed below qualified as commodities, including Verge ("XVG") tokens, Reddcoin ("RDD") tokens, and Dogecoin ("DOGE") tokens.

e.    In certain circumstances, digital assets can also qualify as securities subject to the Securities Act of 1933 and Securities and Exchange Act of 1934 and SEC regulations promulgated

thereunder, including, as relevant here, when unregistered securities styled as digital tokens are issued and sold to investors as part of an ICO. From my participation in this investigation and sources referenced in paragraphs 18 and 21 above and in paragraph 27 below, including my review of investor solicitation materials that were published online by various ICO issuers referenced below, I understand that at all times relevant to this case, Electroneum ("ETN") tokens qualified as securities, and that the ICO tokens that were offered and sold to investors in the seven ICOs referred to below as "ICO-1" through "ICO-7" qualified as securities.

## THE FRAUDULENT SCALPING SCHEME

22. Based on my participation in this investigation and sources referenced in paragraph 18 above, including my participation in interviews with McAfee Team Member-1 and McAfee Team Member-2 and my review of documents and electronic communications corroborating information that they have provided, I have learned the following:

### Overview

a. The scalping scheme generally consisted of the following. *First*, JOHN DAVID MCAFEE, the defendant, directed McAfee Team Member-1 to buy large quantities of a particular altcoin that MCAFEE planned to publicly endorse and then sell. Although MCAFEE typically instructed McAfee Team Member-1 to purchase a given altcoin for MCAFEE's benefit, other McAfee Team members, including McAfee Team Member-1 and CC-1, frequently also mirrored MCAFEE's altcoin trades for themselves. *Second*, after these purchases, MCAFEE published endorsement tweets via his Official McAfee Twitter Account recommending the altcoin in question to the investing public for investment without disclosing that he owned large quantities of the promoted altcoin, and even though he had given false assurances that he would disclose such information in various tweets and public statements during the scheme. *Third*, MCAFEE and other McAfee Team members, including CC-1, then sold their respective investment positions in that altcoin into the temporary but significant short-term price increase that MCAFEE's Twitter endorsements typically generated, often for significant profits. *Finally*, the long-term value of the altcoin typically declined significantly in the year following the inflationary tweets.

b. MCAFEE's endorsement tweets during the scalping scheme included false and misleading statements and omissions

concealing that MCAFEE's true motive for recommending certain altcoins was to artificially inflate their short-term value for his own benefit and did not reflect an unbiased judgment that the altcoins represented promising investments.

      c.    From in or about December 2017 through in or about January 2018, MCAFEE and other McAfee Team members, including CC-1, collectively earned more than $2 million in profits by scalping at least twelve publicly traded altcoins.   From in or about December 2017 through in or about October 2018, MCAFEE and other McAfee Team members, including CC-1, engaged in various efforts to liquidate the digital asset proceeds of their scalping activities.

### MCAFEE Scalps XVG Tokens Based on Misrepresentations

      d.    The first known example of MCAFEE successfully scalping an altcoin occurred in or about mid-December 2017 with an altcoin called Verge ("XVG").

      e.    From my review of Skype communications between MCAFEE and McAfee Team Member-1 (the "McAfee Skype Communications"), I have learned that on or about December 13, 2017, MCAFEE electronically transferred over $15,000 worth of digital assets to McAfee Team Member-1, and MCAFEE directed McAfee Team Member-1 to use about a third of those funds to buy XVG tokens at their then-prevailing market price.

      f.    Based on my review of publicly available portions of MCAFEE's Official McAfee Twitter Account, I have learned that after those purchases of XVG tokens for MCAFEE's benefit, MCAFEE published tweets from on or about December 13 through on or about December 17, 2017 endorsing XVG tokens to investors without disclosing his investment position in XVG.   On or about December 15, 2017, in response to one of MCAFEE's tweets promoting XVG, a Twitter user publicly posted a comment on MCAFEE's Twitter feed asserting that MCAFEE had endorsed XVG to deliberately pump up the market price of XVG tokens.   Despite his purchase of XVG tokens two days earlier, MCAFEE replied with a public tweet falsely claiming:   "I own no XVG.   I live [*sic*] how you shallow folks cannot distinguish between someone who shamelessly speaks his mind — because it's true — and someone with an ulterior motive."

      g.    MCAFEE made a similar misrepresentation during a private conversation with an individual who had invested in a large quantity of XVG tokens prior to MCAFEE's Twitter endorsements of XVG (the "XVG Investor").   Specifically, from my review of

cellphone text messages provided by XVG Investor, I have learned that during a text message conversation on or about December 21, 2017 between XVG Investor and MCAFEE, XVG Investor asked whether MCAFEE had purchased XVG tokens before promoting XVG, and MCAFEE responded by falsely denying that he had done so, writing in pertinent part:  "I bought absolutely none at all.  I could not promote it if I owned it."

        h.    During the period from on or about December 13 through on or about December 17, 2017 in which MCAFEE published tweets endorsing XVG and tweets falsely denying his ownership of XVG, the market price of XVG tokens increased by more than 500% between the opening of trading on or about December 13 and the close of trading on or about December 17, 2017.  From my review of the McAfee Skype Communications, I have learned that, following the short-term inflation of XVG's market price, MCAFEE caused McAfee Team Member-1 to sell all of MCAFEE's XVG tokens, yielding profits of more than $30,000 in digital assets and a return on investment of more than 400% within four days.  In the long term, the market price of XVG tokens fell by more than 85% between the close of trading on or about December 17, 2017 and the close of trading on or about December 17, 2018, one year later.[3]

**MCAFEE Expands the Scalping Scheme**
**through his Fraudulent Coin of the Day/Week Series**

        i.    MCAFEE and CC-1 scalped at least eleven additional altcoins during the period from on or about December 20, 2017 through on or about January 28, 2018.  These altcoins were Electroneum (ETN), Burstcoin (BURST), DigiByte (DGB), Reddcoin (RDD), Humaniq (HMQ), Tron (TRX), Factom (FCT), Dogecoin (DOGE), Stellar Lumen (XLM), Syscoin (SYS) and Ripio Credit Network (RCN) tokens.

        j.    On or about December 20, 2017, following MCAFEE's success in scalping XVG the previous week, MCAFEE launched a "Coin of the Day" series via his Official McAfee Twitter Account in which

---

[3] Unless otherwise indicated, the altcoin market prices referenced in this Complaint are drawn from historical cryptocurrency trading data published online by *CoinMarketCap* or other similar services. Because cryptocurrency trading exchanges are typically open for trading at all times (that is, 24 hours a day, 7 days a week) and do not have a traditional close of trading for altcoins, the "close of trading" prices for altcoins published by such services are typically based on the last recorded price of a particular altcoin on the date in question in coordinated universal time (UTC).

he published tweets endorsing various altcoins to the investing public.  The initiative, which MCAFEE later converted into a "Coin of the Week" series, served as a platform to advance the scalping scheme.  As part of this series, MCAFEE used false and misleading representations and omissions about MCAFEE's motives for publicly endorsing altcoins to investors and his alleged lack of investment in the altcoins that he was promoting to induce purchases that artificially inflated the value of altcoins secretly owned by MCAFEE and other McAfee Team members such as CC-1.

       k.   To announce the Coin of the Day/Week initiative to the investing public, MCAFEE published a tweet on or about December 20, 2017 via his Official McAfee Twitter Account in which he highlighted his alleged knowledge of publicly traded altcoins drawn from his purported market research and review of published whitepapers about them.  In this December 20 tweet (the "False December 20 Tweet"), MCAFEE falsely promised to tell the public if he held an investment position in any of the altcoins that he was promoting, stating:  "The few I'm connected to I will tell you. The rest I have no position in." In full, MCAFEE's False December 20 Tweet stated:



       l.   In that False December 20 Tweet, MCAFEE did not disclose that just a few days before making that supposed disclosure promise, he had used tweets falsely denying that he owned XVG tokens, when in fact he did, to support profitable short-term scalping trades in XVG.  Furthermore, as shown below, MCAFEE repeatedly broke that false disclosure promise in tweets that he later published as part of his Coin of the Day/Week series.

**MCAFEE's First "Coin of the Day" —— Electroneum (ETN)**

       m.   Based on my review of the McAfee Skype Communications, I have learned that on or about December 20, 2017, MCAFEE directed McAfee Team Member-1 to build an investment

position in Electroneum (ETN) tokens.  As a result, McAfee Team Member-1 used more than $100,000 in BTC to buy hundreds of thousands of ETN tokens for MCAFEE, himself, and McAfee Team Member-2.

n.    The next day, after McAfee Team Member-1 purchased ETN tokens for MCAFEE, MCAFEE started publishing tweets via his Official McAfee Twitter Account encouraging members of the investing public to purchase ETN tokens.  For example, based on my review of publicly available portions of the Official McAfee Twitter Account, I know that on or about December 21, 2017, at approximately 10:09AM, MCAFEE published a tweet stating "ELECTRONEUM - The first of my daily coin reports" followed by a link to a report claiming, "I've had more than one DM [*i.e.*, a private direct message on Twitter] calling Electroneum the holy grail of crypto currency . . . . At $0.08 it is seriously cheap."

o.    Contrary to the False December 20 Tweet in which MCAFEE misrepresented that he would disclose any instances in which he held an investment position in his "Coin of the Day," MCAFEE's tweets endorsing ETN did not disclose his investment position in ETN.  Rather, in response to a question on Twitter, MCAFEE falsely denied that he owned any ETN tokens or had any self-interest in touting ETN, misrepresenting in a tweet published on or about December 21, 2017 that:  "I own no ETN.  I am not pumping for my gain.  I am showing you the incredible value of supporting a coin that will change the world."

p.    The market price of ETN tokens increased by about 40% between the close of trading on or about December 20, 2017 and the close of trading the next day.  During that short-term price increase, McAfee Team Member-1 sold MCAFEE's investment position in ETN tokens at a profit.  In contrast, over the long term, ETN's market price fell by approximately 90% between the close of trading on or about December 21, 2017 and the closing price a year later.

### Fraudulent Scalping in Other Altcoins

q.    From on or about December 22, 2017 through on or about January 28, 2018, MCAFEE published a series of "Coin of the Day" or "Coin of the Week" tweets via his Official McAfee Twitter Account in which he publicly endorsed BURST, DGB, RDD, HMQ, TRX, FCT, DOGE, XLM, SYS and RCN tokens to investors.

r.    For each of those altcoins, MCAFEE caused McAfee Team Member-1 to buy hundreds of thousands or even millions of

tokens in the altcoin less than ten days before MCAFEE's "Coin of the Day" or "Coin of the Week" tweet endorsing the altcoin, and then sell out of the investment position in that altcoin as quickly as possible after MCAFEE publicly endorsed the altcoin. CC-1 mirrored those altcoin trades (although CC-1 did so on a smaller scale than MCAFEE and McAfee Team Member-1). As with ETN, MCAFEE did not disclose his investment positions in those altcoins in his tweets publicly endorsing those altcoins, notwithstanding his promise to do so in his False December 20 Tweet. Also, as with ETN, the market price of virtually all of those altcoins experienced a temporary increase after MCAFEE publicly endorsed them, allowing MCAFEE and other McAfee Team members, including CC-1, collectively to earn profits of more than $2 million from their short-term scalping trades in those altcoins. In the long term, however, the market price of each of those altcoins declined significantly as of a year after MCAFEE's endorsement.

        s. From my review of the McAfee Skype Communications between MCAFEE and McAfee Team Member-1 and my participation in interviews of McAfee Team Member-1, I have learned that MCAFEE closely directed the scalping trades in each of the altcoins that he promoted as his "Coin of the Day" or "Coin of the Week" on Twitter, ensuring that the timing of his promotional tweets and the sale of his investment positions in those altcoins were executed to take advantage of the temporarily inflated prices that were stimulated by his endorsement tweets. For example, at approximately 1:51AM on or about December 24, 2017, MCAFEE Skype-messaged McAfee Team Member-1: "[P]ut 20 BTC into Reddcoin if you can. I will post tomorrow morning about Reddcoin. If it reaches 60% above what I paid for it please sell. Thank you [McAfee Team Member-1]. I will post [a]t 9:00 AM." As directed, McAfee Team Member-1 used approximately $280,000 worth of MCAFEE's BTC funds to buy RDD tokens for MCAFEE, and he also invested about the same amount of his own BTC funds in RDD tokens.

        t. As promised, on or about December 24, 2017, at approximately 8:56AM, MCAFEE published the following tweet endorsing RDD via his Official McAfee Twitter Account: "Coin of the day: Reddcoin (RDD) — a sleeper — most widely used social network coin in the world — flying under the radar since 2014. . . ." The tweet included a link to the Reddcoin website.

        u. Contrary to the alleged disclosure promise in MCAFEE's False December 20 Tweet, MCAFEE failed to disclose in that December 24 tweet endorsing RDD that he had invested hundreds of thousands of dollars in RDD tokens just hours earlier. The market price of RDD tokens increased by about 50% between the close

of trading on or about December 23, 2017 and the close of trading on or about December 24, 2017. Shortly after the RDD endorsement tweet, McAfee Team Member-1 sold his and MCAFEE's investment positions in RDD, yielding collective profits for himself and MCAFEE in BTC funds worth more than $350,000 in less than two days. CC-1 also invested approximately $9,600 of his own funds in RDD tokens on or about December 23, 2017 and sold those tokens shortly after the RDD endorsement tweet, yielding a return on investment of about 118% and a profit of more than $11,000 in value in less than two days.

       v. During Skype communications between MCAFEE and McAfee Team Member-1 shortly after the publication of that RDD endorsement tweet, MCAFEE wrote: "[L]et me know when you have finished selling[.]" McAfee Team Member-1 responded: "[I] am finished[.]" MCAFEE replied: "High five[.]" Later that morning, McAfee Team Member-1 sent a series of Skype messages to MCAFEE with an updated tally of their gross scalping proceeds up to that point, which totaled over $1 million worth of digital assets.

       w. While MCAFEE and other McAfee Team members such as CC-1 secretly profited from short-term scalping trades in altcoins that MCAFEE publicly endorsed as his "Coin of the Day" or "Coin of the Week" on Twitter, MCAFEE publicly made misleading statements and omissions encouraging investors to buy and hold long-term investment positions in the promoted altcoins at various points during the scalping scheme. For example, on or about December 26, 2017, in responding to a Twitter user's comment about MCAFEE's "Coin of the Day" tweet endorsing Tron tokens, MCAFEE tweeted misleading claims that "Tron is a long term Hodl.[4] Those who are flipping it are losing out." Similarly, on or about January 28, 2018, in responding to a Twitter user's question asking when to sell the RCN tokens that MCAFEE had endorsed that day, MCAFEE tweeted: "All my recommendation [*sic*] are long term recommendations[.]"

       x. None of MCAFEE's "Coin of the Day" or "Coin of the Week" tweets endorsing the eleven altcoins referenced above disclosed that before publicly endorsing these altcoins for investment, MCAFEE and other McAfee Team members such as CC-1 had

---

[4] Based on my training and experience, and my review of various materials published online, I have learned that "Hodl" is slang in the cryptocurrency community for holding a cryptocurrency rather than selling it, and that an investor who does so is known as a "Hodler."

bought investment positions in these altcoins with the intention of scalping them in the short term.

### CC-1's Assistance Selecting Altcoins to Scalp

23.   In or about June 2019, CC-1 voluntarily participated in a telephonic interview with me and another law enforcement officer. During the interview, CC-1 admitted the following concerning his role in the scalping scheme that he committed with JOHN DAVID MCAFEE, the defendant, and other McAfee Team Members, in substance and in part:

     a.   MCAFEE (through McAfee Team Member-1) and CC-1 (on his own behalf) took investment positions in various altcoins in advance of MCAFEE's "Coin of the Day" tweets endorsing those altcoins.  After accumulating a position in a particular altcoin, MCAFEE would issue tweets endorsing the altcoin as his "Coin of the Day," which increased the market price of the altcoin.  McAfee Team Member-1 and CC-1 would then sell their respective positions in the altcoin being promoted, usually at a profit.

     b.   At a certain point while this scheme was underway, MCAFEE allowed CC-1 to start selecting the altcoins that MCAFEE would endorse in his "Coin of the Day" tweets.  In doing so, MCAFEE instructed CC-1 to use specific parameters for making such selections including the circulating supply, market capitalization, and trading volume of a particular altcoin. (From my training and experience, I believe that MCAFEE chose such criteria in order to identify altcoins that would be easy to "pump and dump" profitably in the short term through Twitter endorsements.)

     c.   MCAFEE instructed CC-1 and other McAfee Team members that they were not permitted to tell anyone else about the altcoins selected for such trading.  For example, on a particular occasion, MCAFEE pulled CC-1 to the side and told CC-1 not to mention to his friends or others what the "Coin of the Day" was going to be because then "it would be like insider trading."

24.   From my participation in this investigation and sources referenced in paragraphs 18 and 22 above, including my review of electronic communications involving JOHN DAVID MCAFEE, the defendant, and CC-1, information and documents collected as part of the parallel SEC investigation, and cryptocurrency exchange trading records associated with various McAfee Team members and publicly available materials, I have learned the following concerning CC-1's role in the scalping scheme:

      a.   CC-1 researched and suggested certain altcoins to MCAFEE for MCAFEE to publicly endorse on Twitter and then scalp. For example, during a text message conversation between CC-1 and his then-wife, McAfee Team Member-3, on or about December 26, 2017 (which was after MCAFEE had endorsed ETN, BURST, DGB, RDD and HMQ tokens), CC-1 wrote:  "So I picked the last three coins and that move made the market cap for all three go from 230 million to 2.5 billion[.]"

      b.   In another example, on or about January 3, 2018, CC-1 sent an email to MCAFEE recommending that DOGE be the next altcoin that MCAFEE should buy, publicly endorse, and then scalp. Specifically, in that email, CC-1 wrote:  "DOGE is on all main markets (15 to 20), thus the price will most likely skyrocket within first minute of your tweet (as usual)."  CC-1 concluded the email:  "If we did purchase today (Wednesday) and DOGE mimics previous coins, I foresee a greater return (100-150%) as a result of allowing DOGE to increase throughout the next 4 days before we tweet."

      c.   At MCAFEE's direction, McAfee Team Member-1 purchased DOGE tokens on or about January 3, 2018 and continued doing so until on or about the morning of January 8, 2018, when MCAFEE published his "Coin of the Week" tweet endorsing DOGE without disclosing his investment position in DOGE.  CC-1 also bought over six million DOGE tokens in the days prior to the announcement.

      d.   The market price of DOGE tokens temporarily increased by about 21% between the low price mark on or about January 7, 2018 and the high mark on or about January 8, 2018 before declining about 15% as of the close of trading on or about January 8, 2018.  Shortly after MCAFEE tweeted his endorsement of DOGE, MCAFEE had McAfee Team Member-1 sell their DOGE positions, yielding collective profits for them of more than $700,000 in BTC in less than two weeks.  CC-1 sold his DOGE tokens less than an hour after MCAFEE's "Coin of the Week" tweet endorsing DOGE, yielding profits of more than $43,000 in BTC in less than a week.

      e.   The long-term trading price of DOGE, however, declined in value by more than 85% between MCAFEE's promotional tweet and on or about January 8, 2019, one year later.

   25.  Based on my review of Google search history results associated with CC-1, I have also learned the following concerning CC-1's DOGE recommendation to JOHN DAVID MCAFEE, the defendant:

a.   On or about January 6, 2018 — which was during the week in which MCAFEE and CC-1 had secretly accumulated investment positions in DOGE while undertaking efforts to inflate the altcoin's market price — CC-1 conducted a Google search for "regulatory laws trading cryptocurrency." Following that search, CC-1 visited several online articles about regulation of the cryptocurrency industry, including a *MarketWatch* article (entitled "Here's how the U.S. and the world regulate bitcoin and other cryptocurrencies") which included a chart summarizing regulations and enforcement actions by the SEC and CFTC regarding fraud and manipulation involving cryptocurrencies. With respect to the CFTC, the chart stated: "The CFTC has designated bitcoin as a commodity and announced that fraud and manipulation involving bitcoin traded in interstate commerce and the regulation of commodity futures tied directly to bitcoin is under its authority."

b.   On or about July 28, 2018, CC-1 performed Google searches for "bad actor definition" and "fraudster defined."

## MCAFEE Lies About His Pump and Dump Activity

26.  Based on my participation in this investigation and sources referenced in paragraph 18 and 22 above, including my review of a recording on YouTube of an interview of JOHN DAVID MCAFEE, the defendant, on a cryptocurrency talk show on or about December 22, 2017 (the "December 22 Interview"), I have learned the following:

a.   The December 22 Interview took place two days after MCAFEE published the False December 20 Tweet in which he falsely promised that he would disclose any instances in which he held a position in his "Coin of the Day," and one day after MCAFEE broke that promise by publicly endorsing ETN as his "Coin of the Day" on Twitter while falsely denying that he had a position in ETN and then scalping his position in ETN.

b.   During the December 22 Interview, which was posted on or about that day on YouTube, MCAFEE reiterated his prior false disclosure promise. Specifically, MCAFEE was confronted during the December 22 Interview about whether his altcoin recommendations on Twitter were really MCAFEE "trying to pump a coin because [he had] invested in it." In response, MCAFEE made the following false claims:

If I say "this is a great coin" and nothing else I promise you I don't own any of it, I'm not affiliated

with it, and I'm not interested in whether or not you buy it. . . . So I'm sorry this is what the world is. Everybody thinks that you are just like everybody else, or that I am, that if I am promoting a coin, I must be benefiting. Absolutely untrue. Listen, if I am 72 years old, what I am I going to do with more money? Seriously, I mean, my knees are bad, what am I going to buy?  I don't need money.  What I need is to create a better world for my children and your children and everybody's children. . . .

         c.   On or about December 29, 2017, after MCAFEE had broken that false disclosure promise at least six times, MCAFEE tweeted a link to a YouTube recording of the December 22 Interview reiterating the false disclosure promise.

         d.   At various points during the scalping scheme, MCAFEE also repeatedly made false statements in response to questions on Twitter from members of the public seeking to understand MCAFEE's motives for promoting particular altcoins as part of his Coin of the Day/Week series, and, in particular, whether MCAFEE was tweeting endorsements of altcoins for self-gain.  Specifically, MCAFEE tweeted false claims on multiple occasions asserting that his recommendations were for long-term investments and that he was not seeking to pump up the stock for his own gain, including the false tweets referenced in paragraph 22(w) above.

## THE FRAUDULENT ICO TOUTING SCHEME

    27.   Based on my participation in this investigation and sources referenced in paragraph 18 above, including my participation in interviews of McAfee Team Member-1 and McAfee Team Member-2 and of various ICO investors and my review of documents and electronic communications corroborating information that they have provided, I have learned the following:

## Overview

         a.   During the period from at least on or about December 20, 2017 through on or about February 10, 2018, JOHN DAVID MCAFEE, the defendant, and other McAfee Team members, including CC-1, conducted Twitter promotions of at least seven ICOs ("ICO-1" through ICO-7," respectively) that qualified as securities offerings in exchange for more than $11 million in ETH and BTC (plus ICO tokens that were then worth millions of dollars) paid to the McAfee Team by the ICO issuers sponsoring those ICOs ("Issuer-

1" through "Issuer-7," respectively).  In each instance, MCAFEE and CC-1 failed to disclose to ICO investors that they and the ICO Issuers were paying the McAfee Team a substantial portion of the funds raised from ICO investors for their touting efforts, despite knowing that they were required to disclose such compensation under federal securities laws.  Furthermore, in several instances during this ICO touting scheme, MCAFEE and CC-1 took active steps to conceal their secret compensation arrangements with ICO issuers from ICO investors, and MCAFEE made false and misleading statements and omissions to hide such deals from ICO investors.

b.    From in or about December 2017 through in or about October 2018, MCAFEE and other McAfee Team members, including CC-1, engaged in various efforts to liquidate the digital asset proceeds of their ICO touting activities.

## Relevant Background on ICOs and Applicable Regulations

c.    Like an initial public offering or "IPO," an ICO is a mechanism by which a business can raise funds from members of the investing public to further goals of the business.  In a traditional IPO, a business corporation typically issues, offers, and sells shares of stock in the corporation to investors in exchange for investment funds.  In an ICO, in contrast, a business typically creates a unique series of digital coins or tokens and then issues, offers, and sells the ICO coins or tokens to potential investors in exchange for consideration, in order to raise money for the business through these investments.  The consideration that the ICO issuer receives from investors often comes in the form of Ether (ETH) and Bitcoin (BTC), but can also be United States dollars or another fiat currency.

d.    On or about July 25, 2017, the SEC publicly issued a report (the "ICO Report") cautioning that initial and other digital coin offerings can be, and often are, offerings that qualify as securities under the federal securities laws.

e.    On or about November 1, 2017, the SEC announced a warning (the "ICO Touting Warning") that anyone who promotes a digital token or coin that qualifies as a security under the federal securities laws must disclose the nature, source, and amount of any compensation received in exchange for the promotion, and that a failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws and may also be a violation of certain other provisions of those laws. The ICO Touting Warning stated in pertinent part:

Celebrities and others are using social media networks to encourage the public to purchase stocks and other investments. These endorsements may be unlawful if they do not disclose the nature, source, and amount of any compensation paid, directly or indirectly, by the company in exchange for the endorsement. . . . Celebrities and others have recently promoted investments in Initial Coin Offerings (ICOs). In the [ICO Report], the [SEC] warned that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. Any celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws. Persons making these endorsements may also be liable for potential violations of the anti-fraud provisions of the federal securities laws, for participating in an unregistered offer and sale of securities, and for acting as unregistered brokers. The SEC will continue to focus on these types of promotions to protect investors and to ensure compliance with the securities laws.

f. News of the ICO Touting Warning was disseminated via articles published online by a variety of news outlets including *The Wall Street Journal*, *The New York Times*, *Forbes*, *Fortune*, *Cointelegraph* and *Medium*.

**Fraudulent Touting of ICO-1**

g. From on or about December 4, 2017 through on or about January 15, 2018, Issuer-1 raised funds from investors in the United States and elsewhere through ICO-1, in which Issuer-1 sold digital ICO-1 tokens to investors in exchange for ETH and BTC, among other digital assets. Issuer-1 solicited such investments through internet-based marketing, including by publishing a whitepaper via Issuer-1's website describing the terms of ICO-1.

h. From my review of DM communications recovered from the Official McAfee Twitter Account, I have learned that on or about December 17, 2017, the founder of Issuer-1 sent MCAFEE a DM asking MCAFEE to promote ICO-1 so that ICO-1 was not lost "in the ocean of ICOs[.]" MCAFEE responded that he would agree to promote ICO-1 by "tweet[ing] [a] reasonable numbers of tweets, which have a huge

impact on the Cryptocurrency market" in exchange for substantial compensation.

        i. In ensuing DMs between Issuer-1's founder and MCAFEE from on or about December 17 through on or about December 19, 2017, MCAFEE and Issuer-1's founder negotiated and ultimately reached agreement on payment terms for the McAfee Team to promote ICO-1 on Twitter.  Pursuant to those terms, Issuer-1's founder agreed that Issuer-1 would pay the McAfee Team thirty percent of the total funds that Issuer-1 raised from the sale of ICO-1 tokens to investors during ICO-1, and would also pay the McAfee Team a substantial percentage of the ICO-1 tokens to be issued to the public.

        j. On or about December 20, 2017, MCAFEE publicly endorsed ICO-1 by tweeting via his Official McAfee Twitter Account that Issuer-1 was offering "[t]he first token to open the door to a new paradigm of social marketing.  This is a world changing coin and a world changing concept.  I urged them to let me assist.  The ICO has just begun."

        k. Later that day, in response to MCAFEE's tweet endorsing ICO-1, a Twitter user posted a comment on MCAFEE's Twitter feed asking MCAFEE if he was paid to promote ICOs such as ICO-1.  MCAFEE publicly replied with a tweet misrepresenting that he was not paid to do so:



        l. In response to another tweet by MCAFEE endorsing ICO-1, a different Twitter user posted another comment on MCAFEE's Twitter feed on or about December 20, 2017 asserting that "[t]he money goes right into John's pocket."  MCAFEE replied by publishing another false and misleading tweet in which he claimed "Wish it did."  In fact, as shown above, MCAFEE started promoting ICO-1 on Twitter that day only after Issuer-1 had agreed to pay MCAFEE and his team almost a third of the proceeds raised by Issuer-1 from ICO-1 investors plus additional compensation for doing so.

m.  While MCAFEE was publicly endorsing ICO-1 via his Official McAfee Twitter Account on or about December 20, 2017, MCAFEE privately asked the founder of Issuer-1 to remove any reference to MCAFEE's affiliation with Issuer-1 from Issuer-1's website to conceal their promotion-for-compensation deal. Specifically, on or about December 20, 2017, MCAFEE wrote in a DM to ICO-1's founder: "[F]or the next few weeks, take my name off your site.  I want to be able to leverage my Twitter with people assuming I have no relationship with you.  Removing my name now will add at least a million dollars to your sale."  In an ensuing DM conversation, Issuer-1's founder initially expressed concerns about doing so, but ultimately agreed to heed MCAFEE's guidance, writing to MCAFEE: "Ok.  We will do that."  He then did as MCAFEE had suggested and so advised MCAFEE in a further DM, writing:  "We have removed your name from the website as requested."

n.  From in or about late December 2017 through in or about mid-January 2018, MCAFEE posted several additional tweets via his Official McAfee Twitter Account promoting ICO-1, none of which revealed that MCAFEE was receiving compensation from Issuer-1 for his endorsements.

o.  As an additional means of promoting ICO-1 for his own benefit, MCAFEE also published tweets in which he made false and misleading claims that he had invested his own personal funds. For example, MCAFEE published a tweet via his Official McAfee Twitter Account on or about December 27, 2017 claiming:  "[ICO-1] is also a great ICO opportunity . . . .  I have personally purchased a significant amount [o]f [Issuer-1 tokens] . . . ."  However, from my review of DMs between MCAFEE and Issuer-1's founder that were recovered from the Official McAfee Twitter Account, I found no DMs indicating that MCAFEE "personally purchased a significant amount [o]f [Issuer-1 Tokens]" using his own funds, as claimed in MCAFEE's December 27 tweet.  Rather, from those DMs, it appears that MCAFEE's only holdings of ICO-1 tokens were paid to MCAFEE and his team by Issuer-1 as compensation for MCAFEE's Twitter campaign promoting ICO-1.

p.  As a result of the undisclosed compensation deal between Issuer-1 and MCAFEE, Issuer-1 ultimately paid MCAFEE and his team more than $6 million in ETH and BTC (plus ICO-1 tokens that were then worth millions of dollars) during the period from MCAFEE's first tweet touting ICO-1 on or about December 20, 2017 through on or about January 15, 2018.

### Losses to Investors in ICO-1

28.  Based on my participation in this investigation and sources referenced in paragraphs 18 and 27 above, including my interview of a victim of the ICO touting scheme who invested in ICO-1 ("Investor-1") and my review of cryptocurrency trading records concerning Investor-1, I have learned the following:

      a.  Investor-1 invested in two ICOs that JOHN DAVID MCAFEE, the defendant, promoted via MCAFEE's Official McAfee Twitter Account, including ICO-1.

      b.  During the period from on or about December 30, 2017 through on or about January 15, 2018, Investor-1 invested approximately $20,000 worth of ETH for the purchase of ICO-1 tokens that were sold by Issuer-1 as part of ICO-1.  Investor-1 made these investments in ICO-1 and the other ICO because of MCAFEE's promotions of those ICOs on Twitter.  Investor-1 was under the impression that MCAFEE: was an expert in the field, based on MCAFEE's representations; was selecting and promoting ICOs that he sincerely believed had potential; and was not being paid for his ICO promotions by the ICO issuers sponsoring such ICOs.

      c.  According to Investor-1, whether MCAFEE was being paid in exchange for his ICO promotions would have been important for Investor-1 to know and would have factored significantly into Investor-1's investment decision.  Investor-1 estimates that he lost between approximately $20,000 and $40,000 as a result of his investment in the two ICOs promoted by MCAFEE, one of which was ICO-1, constituting at least the majority of his investment in ICO-1.

### Fraudulent Touting of Other ICOs
### Including Deals Negotiated by CC-1

29.  Based on my participation in this investigation and sources referenced in paragraphs 18 and 27 above, I have learned the following:

      a.  During the period from on or about December 20, 2017 through on or about February 10, 2018, JOHN DAVID MCAFEE, the defendant, and CC-1 used the Official McAfee Twitter Account to promote at least six additional ICOs (specifically, ICO-2 through ICO-7) in exchange for at least $5 million worth of ETH and BTC from the ICO issuers (in addition to ICO tokens then worth millions of dollars), without disclosing to the public the nature, source,

and amount of compensation that those ICO issuers were paying MCAFEE and his team.

          b.    The McAfee Team's promotion of ICO-2 by Issuer-2 is illustrative of CC-1's role in the ICO touting scheme.

          c.    From on or about January 15, 2018 through on or about March 31, 2018, Issuer-2 raised funds from investors in the United States and elsewhere through ICO-2 in which Issuer-2 sold ICO-2 tokens to investors in exchange for digital assets. Issuer-2 solicited such investments through internet-based marketing, including by publishing a whitepaper via Issuer-2's website describing the terms of ICO-2.

          d.    From my review of emails that were recovered from email accounts of MCAFEE and CC-1, I have learned that the CEO of Issuer-2 initially attempted to contact MCAFEE at an email address that MCAFEE tweeted out on or about January 12, 2018 ("McAfee Team Email Account-1") to which CC-1 had access.   CC-1 then: (i) reviewed emails sent to that email address and selected certain ICO issuers to contact regarding the opportunity to pay MCAFEE to endorse their ICOs via Twitter in exchange for payment; (ii) negotiated payment terms with such ICO issuers; and (iii) subsequently submitted the payment terms for MCAFEE's approval.

          e.    From my review of emails provided by Issuer-2, I have learned that on or about January 12, 2018, the CEO of Issuer-2 sent an email to McAfee Team Email Account-1 providing information about ICO-2.   Two days later, CC-1 emailed a response in which he explained the specifics of how MCAFEE would tout ICO-2 for compensation, writing:  "If you are interested, [MCAFEE] charges 25% of the ICO income, paid daily, and a percentage of the coins.   He will only work with ICOs that use reputable Crowd funding sites so that he is assured the daily income counter is correct."   CC-1 signed the email with his name, "McAfee Team," "Executive Advisor," followed by email addresses at which he could be reached.   On or about January 15, 2018, the CEO of Issuer-2 responded in part "Hi [CC-1] – I am interested. . . ."   Later that day, CC-1 wrote:  "If you can provide evidence of having a way to show proof of daily ICO income, Mr. McAfee can begin his first promotional tweet tonight.   Please keep in mind, 25% of your ICO daily income is required every day of your ICO sale.   Generally, he also takes a percentage of coin; however, he is excluding this [for Issuer-2] . . . ."

f.   After the CEO of Issuer-2 agreed to those terms, he sent an email to CC-1 on or about January 16, 2018 asking if Issuer-2 could add MCAFEE to Issuer-2's website.  CC-1 responded: "Mr. McAfee has requested that you wait until two days after his first tweet to place his name on your website.  There is a reason for everything. . . ."

g.   On or about January 17, 2018, MCAFEE publicly tweeted the following via his Official McAfee Twitter Account: "Want to park your money in a safe place that may have great upside?  ICOs are King in this market . . . .  Be sure to fully read the white papers and check out carefully.  I'm considering [ICO-2]."  MCAFEE's tweet included a link to Issuer-2's website.

h.   As with earlier examples cited above, members of the public viewing MCAFEE's promotional tweets of ICO-2 sought to understand if MCAFEE was being compensated for his promotions.  On or about January 24, 2018, Twitter users posted comments on MCAFEE's Twitter feed asking whether MCAFEE was being paid to promote ICO-2.  In response, MCAFEE publicly tweeted the following misleading claims:

> Why does everyone assume I fucking get paid for everythings [*sic*] I tell people to check out????????  Can't I fucking point out items of interest?  Why the fuck do I need money.  Google me.  And it's fucking rude to ask peopler [*sic*] what they make.  How much do you make at your work??

In fact, per the undisclosed promotion-for-compensation deal negotiated with CC-1, Issuer-2 had already begun paying MCAFEE and his team for his Twitter promotion of ICO-2 approximately five days before, on or about January 19, 2018, and Issuer-2 ultimately paid MCAFEE and his team digital assets worth more than $100,000 for doing so.

## Division of ICO Touting Scheme Profits

30.  Based on my participation in this investigation and sources referenced in paragraphs 18 and 27 above, I have learned that, during the period from on or about December 20, 2017 through on or about February 10, 2018, the seven ICO issuers referred to herein as Issuer-1 through Issuer-7 paid JOHN DAVID MCAFEE, the defendant, as well as CC-1 and the McAfee Team, more than $11 million in ETH and BTC raised from their respective sales of ICO tokens to investors, as compensation for MCAFEE's Twitter promotions of their respective ICOs.  In addition, based on my

review of internal McAfee Team emails that were provided by McAfee Team Member-2, I have learned that on or about May 28, 2018, MCAFEE sent an email with the subject line "Division of Coins" to CC-1 and several other McAfee Team members, including McAfee Team Member-2.  In the email, MCAFEE wrote that "We currently have ove[r] $20 million in coins that have been distributed to us by our ICO and co[i]n partners," and that the proceeds from selling these coins would be divided among specified McAfee Team members, with CC-1 to receive 12% ("[CC-1] – 12%") and MCAFEE to receive 62% ("Me – 62%").

### MCAFEE and CC-1 were Aware of their Obligation to Disclose their Compensation for Promoting ICOs

31.  From my review of the McAfee Skype Communications involving JOHN DAVID MCAFEE, the defendant, I have learned that on or about July 26, 2017 — which was the day after the SEC issued the ICO Report — McAfee Team Member-1 sent a Skype message to MCAFEE with a link to a *Vice* article entitled, "Oh Shit, the SEC Just Ruled that Ethereum ICO Tokens Are Securities," with the subheading, "Some ICOs must be registered or they're unlawful."

32.  I have reviewed a recording posted on YouTube of a December 16, 2017 cryptocurrency talk show interview in which JOHN DAVID MCAFEE, the defendant, and CC-1 participated.  From doing so, I have learned that during this interview, MCAFEE described an ICO project that he was working on called "McAfee Coin" that was purportedly going to comply with SEC regulations, and MCAFEE stated the following about the planned McAfee Coin ICO, in pertinent part:

> It's going to come in the first quarter of 2018.  And we're doing something totally different.  We're not — I am actually trying to adhere to the letter of the law. We're actually in partnership with the Gibraltar stock exchange so that we can make this a legitimate exchange, a legitimate uh, uh entity that the SEC cannot come into a year down the line and say Mr. McAfee you're under arrest.  That's going to happen to a lot of tokens, I promise you. . . .  So I'm doing something different. . . .

33.  Based on my participation in an interview of XVG Investor, and my review of electronic communications between him and JOHN DAVID MCAFEE, the defendant, I have learned the following:

a.  MCAFEE met in person with XVG Investor in or about October 2017 and they subsequently corresponded by text messages

31

and Twitter DMs.  On or about November 2, 2017 — which, as noted,
was the day after the SEC issued the ICO Touting Warning cautioning
that anyone promoting a securities offering styled as an ICO for
compensation must disclose the nature, source, and amount of such
compensation under applicable federal securities laws — XVG
Investor wrote in a DM to MCAFEE:  "I hope the SEC statement about
ICO doesn't negatively affect anything with McAfee coin."  MCAFEE
responded to that DM about two days later without addressing XVG
Investor's reference to the ICO Touting Warning.

     b.  On or about December 27, 2017, MCAFEE sent text
messages to XVG Investor in which MCAFEE threatened to publish
negative tweets about Verge (XVG) tokens (of which XVG Investor
had substantial holdings) if XVG Investor did not pay MCAFEE at
least $100,000 in ETH ("If you sent $100,000 in Ether I will not
tweet, but . . . if you believ[e] you will recover after my tweet
then you are smoking something."), to which XVG Investor responded:
"Why not endorse Verge and just buy the dip?  [. . . .]  If we
don't pay you, you don't have to water down your endorsements by
pointing you are being paid as SEC required."

    34.  Based on my review of Google search history records
associated with CC-1, I have learned that CC-1 conducted internet
research on regulatory developments in the cryptocurrency industry
and reviewed cryptocurrency news articles about such developments.
For example, as noted above, CC-1 conducted a Google search on or
about January 6, 2018 for "regulatory laws trading
cryptocurrency."  Following that search, CC-1 visited several
online articles about regulation of the cryptocurrency industry,
including two cryptocurrency news articles (specifically, a
*CoinDesk* article and a *Blockonomi* article) that both discussed the
SEC's ICO Report cautioning that ICOs can be, and often are,
subject to the federal securities laws.  The *Coindesk* article that
CC-1 visited also discussed the SEC's ICO Touting Warning, stating,
for example, that after issuing the ICO Report in July 2017, the
"SEC itself would go on to warn about celebrity endorsed ICOs and
public-stock scams that use the funding model as a way to entice
investors" and that the SEC "has also pursued civil lawsuits
against ICO organizers since July through a newly-created unit
focused on digital investigations."

    35.  From the voluntary telephonic interview of CC-1 that I
conducted in or about June 2019, I know that CC-1 stated the
following, in substance and in part:

    MCAFEE frequently ranted about the SEC and said the SEC
    was illegal and bad.  MCAFEE also said he could do

whatever he wanted to do and did not have to pay taxes. MCAFEE said consulting and advising the ICO companies was against the rules.  MCAFEE said the SEC was coming after him and he had to flee from the SEC.

### After Getting Caught Failing to Disclose Compensation for Touting ICOs, MCAFEE Turns to a Ghost Promoter

36.  Based on my participation in this investigation and sources referenced in paragraphs 18 and 27 above, I have learned the following:

a.  From approximately January 29 through February 7, 2018, Issuer-3 paid McAfee Team members, including JOHN DAVID MCAFEE, the defendant, and CC-1 more than $660,000 in ETH to conduct a Twitter campaign touting ICO-3 to the investing public. As before, MCAFEE published several tweets via his Official McAfee Twitter Account promoting ICO-3 to the investing public without disclosing the nature, source, or amount of compensation that he and his team were receiving from Issuer-3 for doing so.

b.  On or about February 8, 2018, an internet blogger published a post speculating, based in part on the blogger's analysis of public blockchain records, that several large transfers of digital assets to a single digital wallet address shortly after MCAFEE had publicly endorsed ICO-3 demonstrated that MCAFEE had been paid to endorse ICO-3 without disclosing such compensation (the "Blog Post").  In the Blog Post, the blogger asserted, in part, that MCAFEE "found some project, which could not collect any money for 3 months," "[w]rote about i[t] on Twitter" and "took a big part of investors money immediately," and that MCAFEE's conduct provided "a good reason to write about this to [the] SEC."

c.  From my review of emails recovered from email accounts of MCAFEE and CC-1, I have learned that on or about February 9, 2018, a representative of Issuer-3 sent an email to CC-1 enclosing a link to the Blog Post.  In the email, the Issuer-3 representative told CC-1, in substance and in part, "Please, believe me we have nothing to do with [the Blog Post], this is same trouble for us too," and asked CC-1 to coordinate with MCAFEE about how best to respond to the Blog Post, noting that it was important to announce a response soon, because it would "become suspicious if we remain silent for a long time."  The same day, CC-1 forwarded this email to MCAFEE, writing:  "Sir, Please see below link and review[.]"

     d.   On or about February 11, 2018, MCAFEE publicly tweeted via the Official McAfee Twitter Account a statement entitled "The McAfee Team and ICOs," in which MCAFEE publicly disclosed for the first time that he was being paid for his ICO promotions on Twitter (the "Incomplete Disclosure").   In the Incomplete Disclosure, MCAFEE wrote in part:

> We have been recommending a number of ICOs.  Here is how this comes about:
>
> I post a tweet calling for companies planning an ICO to submit their plans, white papers, etc., to us.  I do this every two weeks.  For each post, we receive between 200 and 300 submissions.  These submissions are reviewed by my full time team.  After the review process, we select 7 to 10 of the ICOs that we feel are the best. We then have these companies audited . . . , at our cost . . . .
>
> Do we charge for these services?  Of course.  Do we charge a lot?  Yes, more than any other agency I know of.  Why?  Because we are worth it.  How much do we charge?  It's no one's business other than ours and the companies that we support.

However, MCAFEE's Incomplete Disclosure failed to disclose the amounts that he had been paid for prior ICO promotions or to identify the particular ICO issuers that had paid him to do so.

     e.   On or about February 12, 2018, another individual ("Individual-1") sent an email to MCAFEE, stating in part that MCAFEE's Incomplete Disclosure was "not quite adequate under [SEC] Rule 17(b),"[5] because although MCAFEE had "admit[ted] that [he was] being compensated," he was required to disclose more. Individual-1 added:  "Look, it's all over the net that you take 25% anyway so why not just go ahead and put it out there."

---

[5] The anti-touting provisions of Section 17(b) of the Securities Act of 1933 make it unlawful for any person to publish any communication in interstate commerce that describes a security (regardless of whether the communication purports to offer the security for sale) in exchange for consideration from an issuer, underwriter, or dealer of the security "without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof."

       f.   Also on or about February 12, 2018, MCAFEE tweeted an endorsement of an ICO, in response to which another Twitter user commented "40% bonus, 25% of every dollar invested to McAfee and team."  MCAFEE replied by tweeting:  "Promotional costs generally run as high as 30%.  I am cheap."

       g.   On or about March 30, 2018, MCAFEE tweeted a link via his Official McAfee Twitter Account to a website that he had created for the "McAfee Crypto Team," which purported to describe the advantages of hiring MCAFEE and his team to promote ICOs, along with their alleged fees.

      37.  I have reviewed DMs between JOHN DAVID MCAFEE, the defendant, and a co-conspirator not named as a defendant herein ("CC-2") that were recovered from MCAFEE's Official McAfee Twitter Account.  Based on my review of those communications and other sources referenced in paragraphs 18 and 27 above, I have learned the following:

       a.   After having been confronted in or about mid-February 2018 for his apparent violation of the federal securities laws by taking undisclosed compensation to promote ICOs, MCAFEE deputized CC-2 in or about March 2018 to issue promotional tweets written by MCAFEE and for which MCAFEE would continue to be compensated, but to conceal CC-2's association with MCAFEE in doing so.  Specifically, on or about March 3, 2018, MCAFEE sent a DM from his Official McAfee Twitter Account to CC-2's Twitter account in which MCAFEE told CC-2:

> Once or twice a week my team recommends an ICO. . . . When we do a promotion, I need someone who is a member of the major crypto trading blogs on the various platforms to help us with outr [*sic*] promotion.  I would like you do be my man in those blogs and help us.

       b.   In another DM that same day, MCAFEE instructed CC-2 to conceal CC-2's association with MCAFEE when CC-2 promoted ICO tokens at MCAFEE's direction, writing:

> Just joining existing blogs in the Crypto trading world. No need to even mention me unless a McAfee hater responds to our promotion on a specific blog.  Do here's the steos [*sic*]:  1.  Research, using Google and/or other tools, to find the largest or most influential blogs, chat boards social media groups, etc[.], in the realm of crypto investing, crypto trading, crypto promotion, ICO discussion groups, etc.  2.  Join these groups and start

interacting with existing members.  Do not mention ne [*sic*] or prom9te [*sic*] anything at all until -- 3.  I give you an ICO or existing coin to promote.  I will write your promotional posts for you for the first few months.

c.    MCAFEE used CC-2 to promote ICO tokens without disclosing the association between MCAFEE and CC-2 in order to continue to profit from promoting ICOs without complying with the securities laws.  For example, on or about March 6, 2018, MCAFEE told CC-2 to promote two ICO tokens that constituted some of MCAFEE's significant holdings of ICO tokens acquired as part of the ICO touting scheme.  CC-2 then began promoting those tokens as MCAFEE had directed, and sent a DM on or about March 10, 2018 informing MCAFEE that CC-2 had created "movement in price" of the tokens.  MCAFEE paid digital currency worth approximately $25,000 to CC-2 between in or about March 2018 and in or about June 2018 in exchange for CC-2's promotion of those tokens.

## LAUNDERING OF FRAUD PROCEEDS AND OTHER
## ACTIVITES IN THE SOUTHERN DISTRICT OF NEW YORK

38.  Based on my participation in this investigation and sources referenced in paragraphs 18, 22 and 27 above, including my participation in interviews of McAfee Team Member-1 and McAfee Team Member-3, and my review of documents and electronic communications corroborating information that they have provided (including my review of records obtained from several banks and digital asset exchanges), I have learned the following:

a.    As shown above, during and as a result of the ICO touting scheme perpetrated by JOHN DAVID MCAFEE, the defendant, and CC-1, as well as other McAfee Team members, Investor-1 invested in ICO-1 tokens based on tweets published by MCAFEE promoting ICO-1 that contained false and misleading representations and omissions.  Based on my interview of Investor-1 and my review of cryptocurrency trading account records provided by the SDNY Exchange, I have learned that Investor-1 resided in the Southern District of New York when he purchased those ICO-1 tokens, and that the digital assets that Investor-1 used to buy those ICO-1 tokens included digital assets that Investor-1 transferred out of his SDNY Exchange account.

b.    As part of the scalping scheme perpetrated by MCAFEE and CC-1 as well as other McAfee Team members, McAfee Team Member-1 and CC-1 used their own respective accounts at a digital asset exchange based in Seattle, Washington to sell altcoins, the

prices of which had been artificially inflated as part of the scalping scheme.  The buyers of certain of these tokens included at least seven investors who resided in the Southern District of New York.

       c.   From approximately late December 2017 through mid-January 2018, McAfee Team Member-1 explored the possibility of opening a digital asset exchange account with the SDNY Exchange that he hoped to use to liquidate (among other things) digital asset proceeds of the scalping scheme into United States currency for the benefit of MCAFEE and himself.  On or about December 25, 2017, McAfee Team Member-1 wrote in a Skype message to MCAFEE:  "I did ask someone and they said [the SDNY Exchange] can do large crypto sales and wire transfers."  On or about January 11, 2018, McAfee Team Member-1 submitted an online application to open an account at the SDNY Exchange, which rejected the application.  On or about January 14, 2018, McAfee Member-1 sent an email to the SDNY Exchange in which he identified himself as an "employee of John McAfee," and threatened to sue the SDNY Exchange for rejecting that application.  On or about January 19, 2018, McAfee Team Member-1 reported via a Skype message to MCAFEE that the California Exchange was blocking him from opening "an account to offload the fiat," and that the "[SDNY Exchange] is shit heads and keeps denying me an account and won't disclose why."

       d.   On or about January 1, 2018, MCAFEE opened an account in his own name at the California Exchange with assistance from CC-1 and McAfee Team Member-3.  During the period from in or about January 2018 through in or about February 2018, at the direction of MCAFEE and CC-1, McAfee Team Member-3 used MCAFEE's California Exchange account to liquidate millions of dollars in digital assets that included (among other funds) proceeds of the ICO touting scheme into United States currency.  On or about January 28 and 29, 2018, at the direction of MCAFEE and CC-1, McAfee Team Member-3 wire transferred about a million dollars in such liquidation proceeds to a bank account registered to MCAFEE in Tennessee.  The California Exchange routed wire transfers of such liquidation proceeds through the SDNY Intermediate Bank before the funds arrived at MCAFEE's bank account in Tennessee.  In or about February 2018, the California Exchange closed MCAFEE's account.

       e.   In or about April 2018, McAfee Team Member-3 submitted an application online to open an account at the SDNY Exchange, which granted the application.  During the period from in or about June 2018 through in or about November 2018, CC-1 transferred (among other funds) hundreds of thousands of dollars

in digital asset proceeds of the ICO touting scheme to the newly opened SDNY Exchange account to be liquidated into United States dollars.

WHEREFORE, I respectfully request that an arrest warrant be issued for JOHN DAVID MCAFEE, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

/s/ sworn telephonically
_____
BRANDON RACZ
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission
of this Complaint by reliable electronic
means, pursuant to Fed. R. Crim. P. 41(d)(3)
and 4.1, this 10th day of February 2021

_____
THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK